# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RONALD B. JACKSON, | : |
| | : |
| Petitioner, | : |
| | : |
| v. | : Civil Action No. 21-1195-JLH |
| | : |
| BRIAN EMIG, Warden, and ATTORNEY | : |
| GENERAL OF THE STATE OF | : |
| DELAWARE, | : |
| | : |
| Respondents.[1] | : |

Ronald B. Jackson.  *Pro se* Petitioner.

Elizabeth R. McFarlan, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware.  Attorney for Respondents.

**MEMORANDUM OPINION**

September 17, 2024
Wilmington, Delaware

---

[1] The Court has substituted Warden Brian Emig for former Warden Robert May, an original party to the case.  *See* Fed. R. Civ. P. 25(d).

Hall, District Judge:

Petitioner Ronald B. Jackson filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging four grounds for relief. (D.I. 1.) He subsequently filed an amended petition that supplemented the same four grounds for relief and provided additional exhibits. (D.I. 9 (together with D.I. 1, the "Petition").) The State filed an Answer in opposition to the Petition, to which Petitioner responded. (D.I. 13; D.I. 16.) On January 31, 2024, the case was reassigned to me. For the reasons set forth below, the Court will deny the Petition.

I. **BACKGROUND**

> On February 13, 2016, [Petitioner], was at the apartment of Tyrone Roberts ("Roberts"), and the two had a dispute. Roberts called 911 and reported that [Petitioner] threatened to kill him and fired a gun at him inside the apartment. [Petitioner] does not dispute that he was at the apartment, but claimed the apartment already had a bullet hole in a window, a shot occurred outside, Roberts was high on PCP and accused [Petitioner] of trying to kill him. Around this same time, officers wearing body cameras were on patrol nearby and heard a shot. They saw [Petitioner] in the area and gave chase. [Petitioner] ran back toward the apartment where he was eventually apprehended on the exterior stairway. While pursuing [Petitioner], the officers observed [Petitioner] throw something that appeared to be a gun and they later recovered a handgun in that area. [Petitioner] testified that he was not the man they saw running. The State did not recover fingerprints, DNA or gunshot residue from the gun. They also did not recover discharged bullets or spent shell casings in the apartment.

*State v. Jackson*, 2020 WL 3428971, at *1 (Del. Super. Ct. June 22, 2020).

In April 2016, a New Castle County grand jury indicted Petitioner on charges of possession of a firearm by a person prohibited ("PFBPP"), possession of ammunition by a person prohibited ("PABPP"), carrying a concealed deadly weapon ("CCDW"), receiving a stolen firearm, aggravated menacing, possession of a firearm during the commission of a felony ("PFDCF") (two

counts), first degree reckless endangering, offensive touching, criminal mischief, resisting arrest, and criminal impersonation. (D.I. 12-1 at Entry No. 3; D.I. 12-8 at 17–21.) The Superior Court severed the PFBPP and PABPP charges upon Petitioner's motion. (D.I. 12-1 at Entry Nos. 9, 10.) The remaining charges were tried to a jury. *See Jackson*, 2020 WL 3428971, at *1. The Superior Court dismissed the offensive touching charge, and the State entered a *nolle prosequi* on the receiving a stolen firearm charge. (D.I. 12-1 at Entry No. 20.) On November 17, 2017, the jury found Petitioner guilty of CCDW, aggravated menacing, PFDCF, first degree reckless endangering, criminal mischief, resisting arrest, and criminal impersonation. *See Jackson*, 2020 WL 3428971, at *1. After the jury verdict, the Superior Court conducted a bench trial on the previously severed charges and found Petitioner guilty of PFBPP and PABPP. (D.I. 12-2 at Entry No. 10.) *See Jackson,* 2020 WL 3428971, at *1. On February 17, 2017, the Superior Court sentenced Petitioner as a habitual offender to a total of 60 years of Level V incarceration, suspended after 35 years for decreasing levels of supervision. (D.I. 12-7 at 58–64.) *See Jackson,* 2020 WL 3428971, at *1. Petitioner appealed, and the Delaware Supreme Court affirmed his convictions and sentence. *See Jackson v. State*, 180 A.3d 1055 (Table), 2018 WL 936845, at *7 (Del. Feb. 16, 2018).

On October 17, 2018, Petitioner filed a *pro se* motion for postconviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion") and a motion to appoint counsel. (D.I. 12-1 at Entry Nos. 47, 48.) A Superior Court Commissioner granted the motion to appoint counsel, and post-conviction counsel filed an amended Rule 61 motion on November 15, 2019. (D.I. 12-1 at Entry. No. 53, 66.) On June 22, 2020, a Superior Court Commissioner issued a Report and Recommendation, finding no merit to any of Petitioner's claims. *See Jackson*, 2020 WL 3428971, at *5. Petitioner filed objections to the Commissioner's Report. (D.I. 12-1 at Entry. No.

3

85.) On November 18, 2020, the Superior Court adopted the Commissioner's Report and Recommendation and denied Petitioner's amended Rule 61 motion. (D.I. 12-15.) The Delaware Supreme Court affirmed that judgment on August 18, 2021. (D.I. 12–18.)

## II.     LEGAL PRINCIPLES

### A.  The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (citation omitted). Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). AEDPA imposes procedural requirements and standards for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### B.  Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the petitioner has exhausted all means of available relief under state law. *See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842–44 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). Section 2254 states, in pertinent part:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or

(B)     (i) there is an absence of available State corrective process; or
(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The exhaustion requirement is based on principles of comity, requiring a petitioner to give "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 844–45; *see Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000). A petitioner satisfies the exhaustion requirement by demonstrating that the issues raised in the petition were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits. *Bell*, 543 U.S. at 451 n.3; *Castille v. Peoples*, 489 U.S. 346, 351 (1989). Methods of "fairly presenting" a federal legal claim to a state court include "(a) reliance on pertinent federal cases employing constitutional analysis; (b) reliance on state cases employing constitutional analysis in like fact situations; (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution; and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).

A petitioner's failure to exhaust state remedies will be excused if state procedural rules preclude him from seeking further relief in state courts. *See Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000); *Teague v. Lane*, 489 U.S. 288, 297–98 (1989). Although treated as technically exhausted, such claims are nonetheless procedurally defaulted. *See Lines*, 208 F.3d at 160; *Coleman v. Thompson*, 501 U.S. 722, 750–51 (1991). Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits

5

of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted.  *See id.* at 750; *Harris v. Reed*, 489 U.S. 255, 260–65 (1989).  Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims.  *See McCandless*, 172 F.3d at 260; *Coleman,* 501 U.S. at 750–51.

To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To demonstrate actual prejudice, a petitioner must show "that [the errors at trial] worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, a federal court may excuse a procedural default if the petitioner demonstrates that failure to review the claim will result in a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001).  A petitioner demonstrates a miscarriage of justice by showing a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496.  Actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998).  In order to establish actual innocence, the petitioner must present new reliable evidence–not presented at trial–that demonstrates "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 537–38 (2006); *Sweger v. Chesney*, 294 F.3d 506, 522–24 (3d Cir. 2002).

**C.  Standard of Review**

When a state's highest court has adjudicated a federal habeas claim on the merits,[2] the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). Pursuant to § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the state court proceeding. 28 U.S.C. § 2254(d)(1),(2); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. The mere failure to cite Supreme Court precedent does not require a finding that the decision is contrary to clearly established federal law. *See Early v. Packer*, 537 U.S. 3, 8 (2002). A decision may comport with clearly established federal law even if the decision does not demonstrate an awareness of relevant Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.* An "unreasonable application" of clearly established federal law occurs when a state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413; *see also White v. Woodall*, 572 U.S. 415, 426 (2014).

### D. Ineffective Assistance of Counsel

---

[2] A claim has been "adjudicated on the merits" for purposes of § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or other ground. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).

In order to establish a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003); *Lewis v. Johnson*, 359 F.3d 646, 656 (3d Cir. 2004). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. Although not insurmountable, this standard is highly demanding and leads to a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Under the second *Strickland* prong, a petitioner must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.*

A court can choose to address the prejudice prong before the deficient performance prong, and the court can reject an ineffective assistance of counsel claim solely on the ground that the defendant was not prejudiced. *See Strickland,* 466 U.S. at 698. If the state court only addresses one prong of the *Strickland* test without addressing the merits of the other prong, and the federal court decides to consider the unaddressed prong, the federal court's review of the unaddressed prong must be *de novo*. *See, e.g., Porter v. McCollum*, 558 U.S. 30, 39 (2009) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*."); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (applying *de novo* review where state courts did not reach prejudice prong under *Strickland*).

### III.    DISCUSSION

8

The Petition asserts the following four claims: (1) trial counsel provided ineffective assistance ("IATC") by failing to "investigate the scene of the alleged crime" and discover evidence proving that it was "physically impossible" for Petitioner to have committed the crime in the manner proposed by the State, and also by failing to present information from the ShotSpotter[3] Detailed Forensic Report that would have supported Petitioner's defense of actual innocence (D.I. 1 at 6, 17; D.I. 9 at 5, 16); (2) trial counsel provided ineffective assistance by failing to use information contained in a psychological evaluation of the State's main witness, Tyrone Roberts, to impeach Roberts' credibility during his cross-examination (D.I. 1 at 8, 18; D.I. 9 at 7, 16–17); (3) admitting the testimony of Wilmington Police Department employee John Martin violated Petitioner's rights under the Confrontation Clause (D.I. 1 at 9, 18–19; D.I. 9 at 8, 17); and (4) the State engaged in prosecutorial misconduct by permitting Wilmington police officer Moses to testify falsely at trial (D.I. 1 at 11; D.I. 9 at 10, 17).

### A. Claim One: IATC For Failing to Visit Crime Scene and Effectively Utilize Information in ShotSpotter Forensic Report

The Supreme Court summarized some of the evidence against Petitioner in its opinion on direct appeal:

> On February 23, 2016 around 3 a.m., Officer James Wiggins and Officer Leonard Moses were on patrol in Wilmington. While conducting a traffic stop around Second Street and Madison Street, they heard a gunshot nearby. They drove toward West 4th Street and saw a black man in black clothing running down an alley. Officer Moses got out of the car and chased the man as Officer Wiggins drove around to try and cut the person off. Officer Wiggins left the car to explore the alley, but did not find anyone there.
>
> Returning to 2nd Street, Officer Wiggins heard Officer Moses call that he saw the suspect. Officer Moses had not seen anyone in the alley and returned to 2nd Street where he saw the suspect standing

---

[3] ShotSpotter is "an acoustic gunshot detection system" that identifies whether a gunshot was fired in an area. (D.I. 12-4 at 14.)

on top of an exterior stairway to 201 North Madison Street. After Officer Moses called out to the suspect, he saw him throw a dark object over the railing. Officer Moses testified that when the object hit the ground it sounded like a gun hitting the pavement.

Officer Wiggins and Officer Moses identified [Petitioner] as the person on the stairs. As [Petitioner] came down the stairs, he told the officers that the person they were looking for went east on 2nd Street. They did not see anyone in that direction. [Petitioner] resisted when the police officers tried to take him into custody. The police officers eventually subdued [Petitioner] on the ground and placed him in the back of their patrol car. There was a black and silver gun on the ground near where [Petitioner] was seized. [Petitioner] gave false names and birth dates when asked to identify himself.

Another police officer, who was not wearing gloves, secured the gun. There were eight rounds of ammunition in the magazine and one round in the chamber. No fingerprints were found on the gun. The gun was not tested for DNA evidence. No gunshot residue tests were performed.

After [Petitioner] was secured, the police officers learned there was a 911 call reporting a shooting in the apartment building at 201 North Madison Street. Officer Wiggins went to the apartment of the caller, Tyrone Roberts. Officer Wiggins saw a bullet hole in a living room window of the apartment. No discharged bullets or spent shell casings were found. A systems administrator with the Wilmington Police Department testified that ShotSpotter, an acoustic detection system company, reported a gunshot on February 23, 2016 at 201 North Madison Street.

The police took [Petitioner] to Wilmington Hospital where he was treated for a cut he suffered during his arrest. [Petitioner] tried to flee at the hospital. He also continued to give the police false names and birth dates.

Roberts testified that [Petitioner] came to his apartment on February 23, 2016 after they had spent time together earlier in the day. Even though [Petitioner] had punched him and sent him threatening text messages that day, Roberts let [Petitioner] into the apartment. According to Roberts, [Petitioner] threatened to kill him, pulled out a gun, and pointed the gun at his face. [Petitioner] fired the gun, creating a hole in the window. [Petitioner] told Roberts that could have been his life.

> Roberts then went to the bathroom where he called 911 on his cell phone. Roberts testified that he did not recall if he smoked PCP that night and that he had previously been found incompetent. The Superior Court denied defense counsel's motion for judgment of acquittal on the charge of Aggravated Menacing, but *sua sponte* dismissed the Offensive Touching charge, which was based on [Petitioner] punching Roberts, because it was unclear if that occurred in Delaware or Pennsylvania.
>
> [Petitioner] testified in his own defense. [Petitioner] testified that, on February 22, 2016, he drove Roberts to Philadelphia in exchange for gas money. After an argument, [Petitioner] left Roberts in Philadelphia. Roberts called [Petitioner] multiple times to demand the return of his money.
>
> According to [Petitioner], he went to Roberts' apartment that night to return Roberts' money. He noticed the odor of PCP when he returned the money to Roberts. He also claimed there was a hole in Roberts' window. While in Roberts' apartment, [Petitioner] heard a gunshot outside of the apartment. [Petitioner] testified that Roberts acted strangely after hearing the gunshot, possibly due to a PCP reaction, and accused [Petitioner] of trying to kill him. [Petitioner] left Roberts' apartment.
>
> When [Petitioner] left the apartment building, he noticed a man running down the street. The police then stopped [Petitioner] and asked him to come down the stairs. [Petitioner] told the police about the running man, but the police arrested [Petitioner]. According to [Petitioner], he gave false names to the police because he was confused and frightened after the police threw him onto the ground. He testified that he tried to flee the hospital because he was nervous about how the police had treated him.

*Jackson*, 2018 WL 936845, at *2–3.

The State's theory at trial was that Petitioner fired a gun inside Roberts' apartment, fled the apartment, was observed in flight by Officers Wiggins and Moses, then returned to Roberts' apartment building and, when on the second story landing of the building's exterior stairwell, threw a gun over the side that the police found on the ground below. In Claim One, Petitioner contends that trial counsel provided ineffective assistance by not investigating the scene of the crime because counsel would have uncovered evidence inconsistent with the State's theory of the

11

case. (D.I. 9 at 5.) In particular, Petitioner asserts that an investigation would have shown that "it was physically impossible for [Petitioner] to fire the gun inside the apartment, exit the two doors, travel through the hallway, down the flight of stairs, and across the courtyard to the alley – within the 14 seconds that were available for him to do so." (*Id*.) Petitioner also alleges that trial counsel was ineffective for failing to present information from the ShotSpotter Detailed Forensic Report that would have supported Petitioner's defense of actual innocence because that Report located the gunshot outside rather than inside Roberts' apartment.

Petitioner presented the same failure-to-investigate argument in his Rule 61 proceeding, supported by an affidavit from Investigator William Browne, a former detective with the Wilmington Police Department. (*See* D.I. 12-14 at 30–31; D.I. 19-2; D.I. 19-3; D.I. 19-4; D.I. 19-5.) In his affidavit, Browne opined that, after visiting the scene of the shooting and evaluating the trial transcripts, "it is clear . . . [Petitioner] could not have been inside Mr. Roberts' apartment during and immediately following the gunshot and also been the person running in the alley who was observed by Officers Wiggins and Moses . . . approximately 14 seconds after the shot was fired." (D.I. 19-3 at 1; D.I. 19-4 at 1.) Browne also stated he was "convinced that the sound [of the gunshot] is consistent with a shot that was fired outside rather than inside and believed "to the best of [his] knowledge, the ShotSpotter system does not detect and geo-locate gunfire indoors." (D.I. 19-4 at 1.)

The Superior Court Commissioner issued a Report and Recommendation ("R&R") rejecting Petitioner's IATC/failure-to-investigate assertion, explaining:

> In the present case, although [Petitioner's] investigator presents an alternative version of the events, he did not unearth any missed available evidence that would have assisted the defense at the time of trial. Rather, the investigator based his analysis on the officers' testimony at trial that it was 1-2 minutes between hearing the shot and seeing [Petitioner] on the top floor of the apartment. [Petitioner]

12

> now seeks to do what *Strickland* specifically forbids – an attack on Trial Counsel's performance with the benefit of hindsight. The test is not what Trial Counsel should have done had she had the benefit of the full trial record *before* trial, but rather what was objectively reasonable at the time of trial.
>
> [Petitioner] admitted he was at the apartment, and the officers saw [Petitioner] in the area. On appeal, the Supreme Court enumerated six categories of evidence from the trial and explained that this was "not a close case." Trial Counsel zealously attacked the State's evidence by challenging whether [Petitioner] was the person seen running in the alley, whether the gunshot occurred inside or outside the apartment, and the absence of ballistic evidence. To grant relief simply because the investigator now proffers another point of view, having the benefit of the trial record, would vitiate the heavy deference given to counsel at the time of counsel's conduct.

*Jackson*, 2020 WL 3438971, at *3.

The Superior Court Commissioner also rejected Petitioner's argument that trial counsel failed to effectively use the information from the ShotSpotter Report, explaining:

> [Petitioner] urges the Court to find that Trial Counsel's tactical decision was ineffective because she did not cross-examine the State's witness with the fact that ShotSpotter detects up to 80% of "outdoor" shots and questioning about its inability to detect shots fired inside would have significantly furthered the defense.
>
> [Petitioner] reads a singular line within the ShotSpotter Report to mean ShotSpotter detects "only" outdoor gunshots. However, that line indicates that ShotSpotter detects 80% "of" outdoor incidents. The preparer of the report was not a witness at trial and according to the State, it would have demonstrated that ShotSpotter is not limited to detection of outdoor gunshots. [Petitioner] has not convincingly demonstrated that the report excludes the detection of indoor gunshots or that his new strategy would have changed the outcome of the proceedings. In fact, on appeal, the Supreme Court stated, "[a]s to [Petitioner's] argument that a page of the ShotSpotter report not admitted into evidence at trial clearly shows the gunshot occurred outside of 201 North Madison Street, the document does not support this argument." Trial Counsel pointed out through cross-examination that ShotSpotter could not identify whether the shot was fired from within or outside a building, nor the apartment or room where the shot may have occurred. The evidence at trial concluded that the shot occurred in the area of the apartment but did

13

> not confirm whether the shot was fired inside or outside. Without any definitive means to attack ShotSpotter's findings at trial further, Trial Counsel's strategy was objectively reasonable.

*Jackson*, 2020 WL 3428971, at *4 (cleaned up). The Superior Court adopted the findings and reasoning of the R&R and denied the IATC argument in Claim One as meritless. The Delaware Supreme Court affirmed that decision "on the basis of and for the reasons assigned by the Superior Court in its report dated June 22, 2020, and order dated November 18, 2020." (D.I. 12-18.) Accordingly, Petitioner is only entitled to relief if the Superior Court's reasons for denying Claim One, which the Supreme Court expressly adopted, were either contrary to, or an unreasonable application of, clearly established federal law or resulted from an unreasonable determination of the facts in light of the evidence presented.

Viewing the state court decision under a "doubly deferential" lens, as I must, there is more than a reasonable argument that counsel satisfied *Strickland*'s deferential standard. In her Rule 61 affidavit responding to the IATC allegations in Claim One, trial counsel explained that she "thoroughly reviewed all documents and discovery material provided by the State, including Body Worn Camera video, ShotSpotter evidence, photographs, statements, surveillance video and police reports" and "did not believe that there was a need to further investigate the crime scene in order to present an effective trial strategy." (D.I. 1-2 at 2.) And, as noted by the Superior Court, Inspector Browne only interpreted known evidence and did not unearth any evidence that trial counsel would have uncovered had she gone to the apartment. In addition, the relevant portions of the ShotSpotter Detailed Forensic Report do not say that the technology cannot detect shots fired indoors or that the shot in this case was fired outdoors.[4] (D.I. 1-1 at 2.)

---

[4] Notably, the trial transcript reveals that trial counsel disputed the State's theory of the case through her cross-examination of the State's witnesses by challenging each point raised in Browne's affidavit: whether Petitioner was the person seen running in the alley, whether the

14

Because Petitioner can't satisfy prong one of *Strickland*, the Court need not address prong two. The Court will deny Claim One.

### B. Claim Two: IATC For Failing to Impeach Roberts with Information from Psychiatric Evaluation

In August 2015, Dr. Schultz, a psychologist with the Delaware Psychiatric Center ("PDC"), issued a letter opinion in connection with the victim's (Roberts) own criminal matter stating that it was "likely" Roberts was not competent to stand trial. (*See* D.I. 12-14 at 21.) In September 2016, approximately one and half months prior to Petitioner's trial, the State provided Dr. Schultz's letter opinion to trial counsel and identified it as potential impeachment evidence. (*Id*. at 23; D.I. 12-1 at Entry No. 16; D.I. 24-2 at 37.)

During Petitioner's trial, the Superior Court conducted a *voir dire* on the issue of Roberts' competency before Roberts took the stand to testify. (D.I. 12-14 at 23.) The State asked Roberts if he understood the difference between the truth and a lie and had him indicate that it was true that the piece of paper the prosecutor was holding up was yellow. (*Id*. at 23–24.) Trial counsel asked Roberts if he understood the consequences for lying on the witness stand. (*Id*. at 24.) At first, Roberts said no, then upon further questioning from trial counsel, stated he knew what perjury was. (*Id*.) The Superior Court determined that Roberts knew the difference between the truth and a lie and found him competent to testify. (*Id*.) Thereafter, Roberts testified about the events that occurred in his apartment, including that Petitioner pointed a gun at his face and fired, creating a hole in the window. *See Jackson*, 2018 WL 936845, at *2. Petitioner testified in his own defense and offered a contradictory version of events, asserting that he did not fire the shot inside the apartment and that he was not the person the police chased. *See id*.

---

gunshot came from inside or outside, and whether there was any ballistic evidence inside the apartment.

In his Rule 61 motion, Petitioner raised the same IATC argument he presents here, namely, that trial counsel provided ineffective assistance by failing to undermine Roberts' credibility by using Dr. Schultz's competency opinion, because that opinion identified Roberts' "significant cognitive deficiencies, including his ability to accurately recall events." (D.I. 12-14 at 7.) According to Petitioner, although trial counsel cross-examined Roberts about his diagnosis of incompetency in front of the jury, counsel should have used the information in Dr. Schultz's competency opinion to further explore Roberts' limitations and his difficulty in perceiving and recalling events and his state of mind the night of the shooting. (D.I. 12-16 at 20.) The Superior Court denied that IATC argument, and the Delaware Supreme Court affirmed that decision.

The Superior Court denied Claim Two after determining that trial counsel's strategy on cross-examination of Roberts was not deficient under *Strickland*'s first prong and did not address *Strickland*'s second prong. (D.I. 24-1 at 10–13, Sealed by Order of the Superior Court and redacted from the published Order.) However, because the portion of the Superior Court's decision analyzing Claim Two remains sealed, this opinion will consider the issue of prejudice under *Strickland*'s second prong, and it will do so *de novo*.

As an initial matter, Petitioner has not demonstrated a reasonable probability that trial counsel would have been permitted to utilize the information in Dr. Schultz's letter opinion in the manner he proposes. As the State argued in Petitioner's Rule 61 proceeding, Dr. Schultz's letter opinion was inadmissible hearsay. What's more, trial counsel vigorously cross-examined Roberts, during which, he acknowledged that he "had a competency evaluation last year . . . [and was] found incompetent." (D.I. 12-4 at 27.) The cross-examination also highlighted the inconsistencies in Roberts' description of events. (D.I. 15-3 at 22–28.) Trial counsel also thoroughly addressed inconsistencies in Roberts' prior statements and testimony during closing arguments. (D.I. 12-5

at 8–12.) Finally, as the Delaware Supreme Court found on direct appeal, "this was not a close case," and Petitioner's convictions were supported by "ample evidence" in addition to Roberts' testimony:

> (i) Roberts' testimony that Jackson fired a gun at him; (ii) Roberts' 911 call; (iii) the testimony of multiple witnesses who heard a gunshot near 201 North Madison Street; (iv) Officer Wiggins' body camera footage capturing the sound of a nearby gunshot; (v) Officer Moses' testimony that he saw [Petitioner] throw away a gun; and (vi) the presence of a gun near where [Petitioner] was arrested.

*Jackson*, 2018 WL 936845, at *6.

Under the totality of these circumstances, Petitioner has failed to demonstrate a reasonable probability that the outcome of his proceeding would have been different but for trial counsel's failure to attempt to impeach Roberts' credibility with information contained in an inadmissible competency opinion rendered a year before Petitioner's trial. Accordingly, Claim Two does not warrant relief.

### C. Claims Three and Four: Procedurally Barred

In Claim Three, Petitioner contends that his Sixth Amendment right to confrontation was violated when the State failed to call the person who prepared the ShotSpotter Report as a witness and, instead, had Wilmington Police Department employee John Martin testify about the results of the ShotSpotter Report. In Claim Four, Petitioner contends that the State engaged in prosecutorial misconduct and violated his due process rights by permitting Officer Moses from the Wilmington Police Department to falsely testify that he saw Petitioner throw a gun from the stairs and heard a metallic sound when it landed. Petitioner asserts that Officer Moses' testimony was untrue because the bodycam footage from Officer Moses' partner did not capture either the throw or the sound.

Petitioner presented these same arguments to the Delaware Supreme Court on direct appeal, without having first presented them to the trial court. Consequently, the Delaware Supreme Court reviewed the arguments in Claims Three and Four for plain error under Delaware Supreme Court Rule 8 and denied relief. *See Jackson*, 2018 WL 936845, at *4 (stating Petitioner "did not raise this objection at trial, so we review for plain error").

It is well-settled that Delaware Supreme Court Rule 8 is an independent and adequate state procedural rule precluding federal habeas review absent a showing of cause for the default, and prejudice resulting therefrom, or that a miscarriage of justice will occur if the claim is not reviewed. *See Campbell v. Burris*, 515 F.3d 172, 182 (3d Cir. 2008). By explicitly applying the procedural bar of Rule 8, the Delaware Supreme Court articulated a "plain statement" under *Harris v. Reed*, 489 U.S. 255, 263–64 (1984) that its decision rested on state law grounds. Thus, the Court cannot review the merits of Claims Three and Four absent a showing of cause for the default, and prejudice resulting therefrom, or upon a showing that a miscarriage of justice will occur if the Claims are not reviewed.

Petitioner asserts trial counsel's ineffective assistance as cause for his default of both claims. Ineffective assistance provided by trial counsel can constitute cause for a procedural default if that particular ineffective assistance allegation was presented to the state courts as an independent claim and it was determined that counsel's error amounted to constitutionally ineffective assistance. *See Murray*, 477 U.S. at 488–89. However, an ineffective assistance of trial counsel claim cannot constitute cause if the IATC claim itself is procedurally defaulted. *See Edwards v. Carpenter*, 529 U.S. 446, 451–54 (2000).

Here, Petitioner's Rule 61 motion and subsequent post-conviction appeal did not present IATC arguments concerning trial counsel's failure to preserve the Confrontation Clause contention

18

in Claim Three or the prosecutorial misconduct argument in Claim Four. Therefore, these two IATC allegations are defaulted and cannot constitute cause for Petitioner's default of Claims Three and Four.

Although Petitioner's failure to demonstrate cause obviates the need to address the issue of prejudice, the Court nevertheless finds that Petitioner cannot demonstrate prejudice from the procedural default of either claim. With respect to Claim Three, Wilmington police department employee Martin did not testify as to whether the gunshot either did or did not come from inside the apartment. His testimony explained why the police were responding to that location and established the time the shot was reported. And, as the Delaware Supreme Court noted, "[m]ultiple witnesses, including [Petitioner] testified that they heard a gunshot near 201 North Madison Street." *Jackson*, 2018 WL 936845, at *4. As for Claim Four, the transcript reveals that the bodycam video was played for the jury during the trial, thereby providing the jury with an opportunity to determine if there was a discrepancy between Officer Moses' testimony and the video. Notably, the Delaware Supreme Court found that "the body camera footage in the record does not support [Petitioner's] speculation" that Officer Moses lied about seeing Petitioner throw the gun over the side of the exterior stairs. *Jackson*, 2018 WL 936945, at *7.

The miscarriage of justice exception does not excuse Petitioner's procedural default because he has not provided new reliable evidence of his actual innocence. Accordingly, the Court will deny Claims Three and Four.

## IV. CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the

denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has concluded that the instant Petition does not warrant relief. In the Court's view, reasonable jurists would not find this conclusion to be debatable. Accordingly, the Court will not issue a certificate of appealability.

**V.     CONCLUSION**

For the reasons discussed, the Court will deny the instant Petition without holding an evidentiary hearing or issuing a certificate of appealability. An appropriate Order will be entered.